NINA F. LOCKER, State Bar No. 123838
RODNEY G. STRICKLAND, JR., State Bar No. 161934
KEITH E. EGGLETON, State Bar No. 159842
EVAN L. SEITE, State Bar No. 274641
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email:  nlocker@wsgr.com
        rstrickland@wsgr.com
        keggteton@wsgr.com
        eseite@wsgr.com

*Attorneys for Defendants*
*Dropbox, Inc., Andrew W. Houston, Ajay V.*
*Vashee, Timothy J. Regan, Arash Ferdowsi,*
*Robert J. Mylod, Jr., Donald W. Blair, Paul E.*
*Jacobs, Condoleezza Rice, R. Bryan Schreier,*
*and Margaret C. Whitman*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE DROPBOX, INC. SECURITIES LITIGATION | CASE NO.:  5:19-cv-06348-BLF |
| | CLASS ACTION |
| | **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DROPBOX DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Hearing Date:  July 30, 2020<br>Time: 9:00 a.m.<br>Judge:  Hon. Beth Labson Freeman<br>Courtroom:  3, 5th Floor |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................... 1

STATEMENT OF ISSUES ...................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    Dropbox's Business ....................................................................... 2

    B.    Dropbox's Historical Revenue and Paying User Growth ...................... 4

    C.    Dropbox's Continued Post-IPO Growth ............................................ 5

    D.    This Lawsuit ................................................................................. 6

ARGUMENT ............................................................................................................ 7

I.      LEGAL STANDARD ................................................................................ 7

II.     PLAINTIFFS' THEORY OF LIABILITY IS MERITLESS .............................. 8

III.    NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE ............. 11

    A.    Accurate Statements of Historic Paying User Results Are Not Actionable .......... 11

    B.    Opinions Regarding Registered User Characteristics Are Not Actionable .......... 12

    C.    Plaintiffs' Allegations Regarding User Cohorts Are Not Actionable ................. 16

IV.    PLAINTIFFS HAVE NOT STATED A CLAIM UNDER ITEM 303 ............. 18

V.     PLAINTIFFS' CLAIMS ARE TIME-BARRED ......................................... 19

VI.    PLAINTIFFS' SECTION 15 CLAIM FAILS .............................................. 20

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arfa v. Mecox Lane Ltd.*,
  No. 10 Civ. 9053, 2012 WL 697155, *aff'd*, 504 F. App'x 14 (2d Cir. 2012) .....................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................................7

*Belodoff v. Netlist, Inc.*,
  No. SA CV 07-00677 DOC, 2008 WL 2356699 (C.D. Cal. May 30, 2008) .....................16

*Belodoff v. Netlist, Inc.*,
  No. SACV0700677 DOC, 2009 WL 2777320 (C.D. Cal. Sept. 1, 2009).....................8, 18

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) .............................................................................12

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002)...............................................................................................9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  65 F. Supp. 3d 840 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017)..........................8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)..............................................................................................14

*City of Pontiac Gen. Emps.' Ret. Sys v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)...............................................................................................19

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  No. 18-CV-04844-BLF, 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) .............................8

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010)................................................................................................7

*F.D.I.C. v. Countrywide Fin. Corp.*,
  No. 2:12-CV-4354 MRP, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ..........................19

*Fresno Cty. Emps. Ret. Ass'n. v. Alphatec*,
  607 F. App'x 694 (9th Cir. 2015)........................................................................................19

*Garber v. Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009)...........................................................................................8

*Greenberg v. Sunrun Inc.*,
  233 F. Supp. 3d 764 (N.D. Cal. 2017) ..........................................................................9, 20

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013)..............................................................................................7

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) ...............................................................16

*In re Netflix, Inc. Sec. Litig.*,
   No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ..................................10

*In re Ocera Therapeutics, Inc. Secs. Litig.*,
   No. 17-CV-06687-RS, 2018 WL 7019481 (N.D. Cal. Oct. 16, 2018)................................13

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012)............................................................................20

*In re Skechers USA, Inc. Sec. Litig.*,
   No. 18 CIV. 8039 (NRB), 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020)...................10, 14

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996).........................................................................7, 15

*In re Verifone Sec. Litig.*,
   784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993)....................10, 12

*In Re Violin Memory Sec. Litig.*,
   No. 13-CV-5486 YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) .............................11

*J&R Mktg., SEP v. Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008)............................................................................18

*Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ..............................................................13

*Mallen v. Alphatec Holdings, Inc.*,
   No. 10-CV-1673-BEN MDD, 2013 WL 1294640 (S.D. Cal. Mar. 28, 2013),
   *aff'd sub nom. Fresno Cty. Emps. Ret. Ass'n. v. Alphatec*, 607 F. App'x 694
   (9th Cir. 2015)........................................................................................18

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ..............................................................10

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ....................................................................................19

*Monachelli v. Hortonworks, Inc.*,
   225 F. Supp. 3d 1045 (N.D. Cal. 2016) ..............................................................12

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996)................................................................................11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*,
   575 U.S. 175 (2015) ..............................................................................7, 14, 15

*Or. Pub. Empls. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)...........................................................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)...........................................................................9

*Rieckborn v. Jefferies LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ..................................................................20

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006), *aff'd*, 551 F.3d 1156 (9th Cir. 2009) ....................7

*Rudman v. CHC Grp. LTD*,
    217 F. Supp. 3d 718 (S.D.N.Y. 2016) ................................................................19

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ..................................................................11, 18

*Welgus v. TriNet Grp., Inc.*,
    No. 15-CV-03625-BLF, 2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ....................9, 19, 20

*Welgus v. TriNet Grp., Inc. ("Welgus II")*,
    No. 15-CV-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017),
    *aff'd*, 765 F. App'x 239 (9th Cir. 2019) ........................................................7, 18

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ..............................................................12, 17

*West v. eHealth, Inc.*,
    No. 3:15-CV-00360-JD, 2016 WL 948116 (N.D. Cal. Mar. 14, 2016) ..............................13

**STATUTES**

15 U.S.C. § 77k(a) .................................................................................7

15 U.S.C. § 77m ...................................................................................19

15 U.S.C. § 77o ...................................................................................20

**RULES**

17 C.F.R. § 229.303 ...............................................................................18

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 30, 2020, or as soon thereafter as the matter may be heard before the Honorable Beth Labson Freeman of the United States District Court for the Northern District of California, 280 South First Street, San Jose, CA 95113, Defendants Dropbox, Inc. ("Dropbox" or the "Company"), Andrew W. Houston, Ajay V. Vashee, Timothy J. Regan, Arash Ferdowsi, Robert J. Mylod, Jr., Donald W. Blair, Paul E. Jacobs, Condoleezza Rice, R. Bryan Schreier, and Margaret C. Whitman (collectively, the "Dropbox Defendants") will, and hereby do, move to dismiss the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "CAC") (ECF No. 68) pursuant to the Federal Rules of Civil Procedure 8 and 12(b)(6).  This motion is supported by the Memorandum of Points and Authorities, the Declaration of Evan L. Seite and attached exhibits ("Ex.__"), the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

**STATEMENT OF ISSUES**

1.      Whether the CAC adequately states a claim under Section 11 of the Securities Act of 1933 (the "Securities Act") based on plaintiffs' allegations that the Dropbox Defendants made false or misleading statements in Dropbox's Registration Statement filed on Form S-1 in connection with Dropbox's March 23, 2018 IPO.

2.      Whether the claims in the CAC are time-barred.

3.      Whether the CAC states a claim under Section 15 of the Securities Act where it does not plead a primary violation of Section 11 of the Securities Act.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**PRELIMINARY STATEMENT**

Dropbox provides users with cloud-based storage and collaboration services on both a free and paid subscription basis.  In March 2018, Dropbox completed its initial public offering ("IPO").  In each quarter since the IPO, Dropbox has grown its number of paying users and revenue.  In August 2019, however, Dropbox's share price slid below its offering price, and this securities class action lawsuit followed.  Plaintiffs' central theory is that Dropbox violated Section 11 of the Securities Act of 1933 (the "Securities Act") because it failed to disclose that,

at the time of its IPO, it was experiencing a slowing rate of revenue growth as a result of a decline in the rate at which it converted free users to paying users.  This claim does not withstand scrutiny.  Plaintiffs cannot state a claim regarding user conversion rates because they do not plead a single fact regarding Dropbox's conversion rates at any time, much less that Dropbox misleadingly omitted a material fact about them, as is required.  Instead, plaintiffs' factual allegations focus exclusively on Dropbox's overall paying user and revenue growth rates. Dropbox's disclosures regarding those metrics were perfectly clear:  Dropbox disclosed that its rate of paying user growth had slowed at the time of the IPO and that its rate of revenue growth had slowed as well and could continue to slow in the future.  Plaintiffs cannot state a claim by alleging Dropbox misleadingly omitted facts that it plainly disclosed.

Even setting aside that fundamental flaw in their theory, plaintiffs' allegations regarding each of the statements they challenge as misleading fail for additional reasons.  Plaintiffs' attempt to contort Dropbox's accurate statements about its past performance into implicit guarantees of future growth violates black-letter law that such statements of historical performance are not actionable.  Further, plaintiffs fall far short of their burden to challenge Dropbox's positive forward-looking opinions about its users.  Finally, plaintiffs did not file their complaints until after the one-year statute of limitations under the Securities Act had run. Accordingly, plaintiffs' claims are time barred.

## FACTUAL BACKGROUND

### A.   Dropbox's Business

Headquartered in San Francisco, Dropbox is one of the world's largest providers of cloud-based storage and collaboration services.  On March 23, 2018, Dropbox conducted an IPO of its Class A stock, with shares priced at $21 each.  Consolidated Class Action Complaint (the "CAC" or "¶") ¶ 39.  In connection with its IPO, Dropbox filed a Form S-1 with the SEC, which, after amendments, was declared effective on March 22, 2018 (the "Registration Statement" or "RS") (Ex. 1).  ¶ 1 n.1.

At the time of its IPO, Dropbox had more than 500 million registered users across 180 countries.  RS at 1.  Dropbox generates revenue from its "paying users"—*i.e.*, users who opt to

purchase subscription products with premium functionality.  *Id.* at 62-64.  The Registration

Statement informed investors that, of Dropbox's more than 500 million registered users, 11

million were paying users.  *Id.* at 1.  That number has grown by hundreds of thousands of users

in every quarter since the IPO.  *See* Exs. 2-9.  Dropbox's revenue has also grown every quarter

since the IPO.  ¶ 50; *see also* Exs. 2-9.

Dropbox provides a free product, Dropbox Basic, as well as paid subscription services.

RS at 64.  Dropbox's business model is premised on three principal factors:  driving new users

(whether free or paying) to sign up for Dropbox; increasing the conversion of free users to

paying users; and upgrading and expanding the subscription products used by existing paying

users.  *Id.* at 64-67.  These factors grow revenue by increasing one or both of the key metrics that

determine Dropbox's revenue:  the number of paying users and the revenue generated per user.

Each is described below.

**Driving new user signups.**  Dropbox is specifically designed to encourage new user

adoption—*i.e.*, it is easy for users to try, use, and buy Dropbox's plans.  *Id.* at 4, 104.  Once

registered, users often share and collaborate with other non-registered users, thereby attracting

additional signups.  *Id.*  New users can sign up for free or as paying users under a subscription

plan.  *Id.* at 103.

**Increasing user conversion to paid plans.**  Dropbox's free product offering, Dropbox

Basic, serves as a major funnel to convert free users to paying users.  ¶ 44; RS at 64.  Dropbox

tracks certain characteristics of its users—for example, whether the user signed up from a

business email domain; the types of computers or devices with which the user accessed Dropbox

(or if the user linked a laptop or desktop directly to the Dropbox app); and whether the user

signed up from certain developed countries.  RS at 64, 104.  Dropbox uses its user data to

encourage user conversions through targeted marketing.  *See id.* at 64.

**Upgrading and expanding existing paying users.**  Dropbox encourages paying users to

upgrade their subscription plans.  *E.g.*, *id.* at 65.  For example, if an individual paid user

collaborates with others on Dropbox, Dropbox encourages that user to upgrade to a Dropbox

1    Business team plan.  *Id.*  Dropbox also encourages existing Dropbox Business teams to upgrade

2    by purchasing additional licenses or plans with enhanced features.  *Id.*

3        **B.      Dropbox's Historical Revenue and Paying User Growth**

4              Dropbox's Registration Statement provided investors with detailed information about

5    Dropbox's historical performance, including revenue and paying user growth.  With respect to

6    Dropbox's historical revenue, the Registration Statement disclosed the Company's revenue

7    performance and growth on both an annual and quarterly basis.  For example, the first page of

8    the Registration Statement stated, "[o]ur revenue was $603.8 million, $844.8 million, and

9    $1,106.8 million in 2015, 2016, and 2017, respectively, representing an annual growth rate of

10   40% and 31%, respectively."  *Id.* at 1.  Dropbox explained that its annual revenue growth was

11   primarily due to paying user growth.  *Id.* at 76, 78.  In its discussion of "Quarterly Results of

12   Operations" (*id.* at 80), Dropbox provided investors with quarterly revenue results for the eight

13   quarters preceding the IPO, from Q1'16 through Q4'17:

14
|  | **Three months ended** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | March 31, 2016 | June 30, 2016 | September 30, 2016 | December 31, 2016 | March 31, 2017 | June 30, 2017 | September 30, 2017 | December 31, 2017 |
|  | | | | *(In millions)* | | | | |
| Revenue | $ 185.0 | $200.8 | $    221.0 | $    238.0 | $ 247.9 | $266.7 | $    286.7 | $    305.5 |

17   As with its annual revenue growth, Dropbox explained that, "[o]ur revenue increased

18   sequentially in each of the quarters presented primarily due to increases in the number of paying

19   users."  *Id.* at 81.

20             The Registration Statement also disclosed the number of paying users at the end of each

21   of the prior three years, as well as the average revenue per paying user ("ARPU"), a metric

22   reflecting Dropbox's revenue divided by the average number of paying users during the same

23   period.  *Id.* at 14, 17; *see also* ¶ 43.  From 2015 to 2016, Dropbox grew its paying users from 6.5

24   million to 8.8 million, a 35% growth rate.  RS at 14, 78.  From 2016 to 2017, Dropbox's paying

25   users grew from 8.8 million to 11 million, a 25% growth rate.  *Id.* at 14, 76.  Dropbox also

26   explained that its ARPU experienced a decline from 2015 to 2016 as a result of foreign currency

27   fluctuations for sales in foreign currencies, but increased from 2016 to 2017 "primarily due to an

28

increased mix of sales towards our higher priced subscription plans, including our new Dropbox Business Advanced plan." *Id.* at 70.

In addition to providing information about its historical performance, the risk disclosures in the Registration Statement warned Dropbox's investors in detail about the risks associated with Dropbox's revenue and paying user growth.  In fact, two of the first three risks summarized in the Registration Statement's "Risk Factors Summary" stated that Dropbox's "future growth could be harmed if we fail to attract new users or convert registered users to paying users," and that its "revenue growth rate has declined in recent periods and may continue to slow in the future." *Id.* at 5.  The full text of the risk disclosures provided additional detail.  With respect to revenue growth, Dropbox noted that while it had "experienced significant revenue growth in prior periods," its "rates of revenue growth are slowing and may continue to slow in the future." *Id.* at 17.  Dropbox explained the factors that could contribute to growth rate declines, including higher market penetration and maturation of the business.  *Id.*  And Dropbox warned potential investors that they "should not rely on the revenue growth of any prior quarterly or annual period as an indication of our future performance." *Id.*

Dropbox likewise provided warnings regarding its ability to continue to convert free users to paying users.  It warned that "[i]f we . . . fail to convert our registered users to paying users, demand for our paid services and our revenue may grow more slowly than expected or decline," *id.*, and noted that, "[a]s of December 31, 2017, we served over 500 million registered users but only 11 million paying users" and "[a] majority of our registered users may never convert to a paid subscription to our platform." *Id.* at 16.

**C.     Dropbox's Continued Post-IPO Growth**

In the two years since its IPO, Dropbox has continued to grow.  Annual revenue has grown from $1.1 billion in 2017 to $1.6 billion in 2019—a *45%* increase in just two years. Ex. 9 at 39. Dropbox's paying user metric has also continued to climb; the Company recently disclosed that it has 14.3 million paying users, a 30% increase since the IPO.  *Id.* at 5.  The chart below, which reflects Dropbox's reported performance over 16 quarters (Q1'16 through Q4'19), demonstrates

that revenue and paying user growth has been strong and remarkably consistent in <u>every single reported quarter</u> both before and after the IPO.  Seite Decl. ¶¶ 2-10 (citing Exs. 2-9).

**Dropbox's Revenue and Paying Users: Q1'16 to Q4'19**



In light of Dropbox's strong performance, it is unsurprising that for the vast majority of the sixteen months following its IPO, Dropbox's stock consistently traded above its IPO price. Before August 9, 2019, Dropbox's share price closed above the IPO price on over 97% of the 347 days on which it traded.  Seite Decl. ¶ 11.

       **D.**       **This Lawsuit**

     In August 2019—more than sixteen months after its IPO—Dropbox's stock price dropped below the $21/share IPO price after it announced its second quarter 2019 results.  On October 4, 2019—more than eighteen months after the IPO—plaintiffs filed the two complaints that were subsequently consolidated into this action.  *See* ECF No. 65 (consolidation order).  On March 2, 2020, plaintiffs filed the CAC, which asserts claims under Sections 11 and 15 of the Securities Act on behalf of "all persons who purchased and/or otherwise acquired Dropbox common stock pursuant or traceable to the Registration Statement . . . ."  ¶ 1.

1

**ARGUMENT**

2

**I.   LEGAL STANDARD**

3        To state a claim under Section 11, plaintiffs must plead facts showing that the Registration

4   Statement contained an untrue statement of material fact or omitted to state a material fact

5   necessary to make the affirmative statements not misleading.  15 U.S.C. § 77k(a); *Omnicare, Inc.*

6   *v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 178-79 (2015); *Rubke v.*

7   *Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1133-34 (N.D. Cal. 2006), *aff'd*, 551 F.3d 1156 (9th

8   Cir. 2009).  Plaintiffs cannot merely rely on events after the IPO to state a claim; they must plead

9   facts showing that the statements they challenge were misleading at the time of the IPO.  *See*

10  *Rubke*, 551 F.3d at 1133-34.  Moreover, a challenged statement is actionable only if it was

11  materially false or misleading when read in the context of the entire document.  *Omnicare*, 575

12  U.S. at 190 (explaining that a Section 11 claim "always depends on context," and a challenged

13  statement must be read "in light of all its surrounding text, including hedges, disclaimers, and

14  apparently conflicting information"); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4, 1409

15  (9th Cir. 1996) (finding it appropriate on motion to dismiss to consider of full text of prospectus

16  and statements in context, including portions not mentioned in complaint).

17       To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must plead "sufficient factual

18  material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Welgus v.*

19  *TriNet Grp., Inc.* ("*Welgus II*"), No. 15-CV-03625-BLF, 2017 WL 6466264, at *4 (N.D. Cal.

20  Dec. 18, 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)), *aff'd*, 765 F. App'x 239

21  (9th Cir. 2019).  Allegations that are "merely consistent with" plaintiffs' theory of liability are

22  insufficient; "[s]omething more is needed, such as facts tending to exclude the possibility that the

23  alternative explanation is true."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1008

24  (9th Cir. 2013).  In addition, the Court need not credit as true any allegations "that contradict . . .

25  matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted

26  deductions of fact, or unreasonable inferences."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d

27  992, 998 (9th Cir. 2010).  In evaluating plaintiffs' claims, the Court may properly consider

28  "documents incorporated into the complaint by reference, and matters of which a court may take

1    judicial notice." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

2    65 F. Supp. 3d 840, 848 (N.D. Cal. 2014) (citation omitted), *aff'd*, 856 F.3d 605 (9th Cir. 2017).

3    Here, the Court should consider Exhibits 1 and 2 because they are incorporated by reference in

4    the CAC, and take judicial notice of Exhibits 1 through 10, which are SEC filings and stock price

5    data that are properly subject to judicial notice. *City of Sunrise Firefighters' Pension Fund v.*

6    *Oracle Corp.*, No. 18-CV-04844-BLF, 2019 WL 6877195, at *23 (N.D. Cal. Dec. 17, 2019)

7    (taking judicial notice of documents incorporated by reference, SEC filings, and stock price

8    information).

9    **II.     PLAINTIFFS' THEORY OF LIABILITY IS MERITLESS**

10          Plaintiffs' theory of liability is meritless.  Plaintiffs claim that several statements in the

11   Registration Statement were misleading because Dropbox failed to disclose that, at the time of its

12   IPO, its revenue growth rate was slowing as a result of a decline in the rate at which it converted

13   free users to paying users.  *E.g.*, ¶¶ 49, 50, 57, 59, 62.  This claim fails because: (i) the CAC has

14   no factual allegations regarding user conversion; (ii) Dropbox was not required to disclose its

15   free-to-paid user conversion numbers because that number was subsumed within the total

16   number of paying users, which Dropbox did disclose; and (iii) Dropbox disclosed that the rate of

17   paying user growth declined before the IPO, and most importantly, disclosed that the rate of

18   revenue growth had declined and could continue to do so in the future.

19          As an initial matter, although plaintiffs' claim is premised on an alleged decline in the

20   rate of converting free to paid users, the CAC does not include any factual allegations about what

21   Dropbox's conversion rate was at any point in time, before or after the IPO.  In fact, all plaintiffs

22   offer is the conclusory allegation that "the rate at which Dropbox was converting its non-paying

23   registered users to paying subscription users was decelerating."  ¶¶ 3, 48, 50, 51, 53, 57, 59, 62.

24   Such factually bereft allegations are insufficient to state a claim.  *E.g.*, *Belodoff v. Netlist, Inc.*,

25   No. SACV0700677 DOC, 2009 WL 2777320, at *11 (C.D. Cal. Sept. 1, 2009) (dismissing

26   Section 11 allegations where plaintiffs made "no factual showing whatsoever" regarding the

27   alleged omission); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (affirming

28   dismissal of Section 11 claim based on alleged omission of "dramatic" increase in expenses

1    where "th[e] complaint does not contain a single factual allegation relating to the magnitude of

2    the expense increase," which was required to determine whether the alleged omission was

3    material); *cf. Welgus v. TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 167708, at *13

4    (N.D. Cal. Jan. 17, 2017) (rejecting control person allegations under Section 15 of the Securities

5    Act as "too conclusory" in the absence of "any facts to show that [the defendant] had the power

6    to and did control the [issuers'] activities").

7         The absence of any factual allegations in the CAC regarding Dropbox's user conversion

8    rate is not surprising; user conversion is not a performance metric that Dropbox used in either the

9    Registration Statement or in subsequent disclosures.  Instead, and as discussed further herein,

10   Dropbox disclosed the number of paying users, which subsumes both free-to-paid conversions

11   and new users who sign up for subscription plans without ever having a free account.  That

12   metric is used to calculate total revenue (in combination with ARPU).  As Dropbox disclosed,

13   paying users drove Dropbox's revenue growth in the eight quarters leading up to the IPO.  RS at

14   76, 78, 81.  In light of its disclosure of paying users, Dropbox had no duty to disclose any further

15   detail about free-to-paid user conversions.  The Ninth Circuit has "expressly declined to require a

16   rule of completeness for securities disclosures because '[n]o matter how detailed and accurate

17   disclosure statements are, there are likely to be additional details that could have been disclosed

18   but were not.'"  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th

19   Cir. 2014) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002));

20   *Brody*, 280 F.3d at 1006 n.8 (where a company makes a disclosure about sales growth, it need

21   not provide "a detailed breakdown of the company's region by region or month by month

22   sales."); *see also Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 773 (N.D. Cal. 2017) (applying

23   *Brody*'s holding to Section 11 claim).

24        The only factual allegations in the CAC relate to Dropbox's rates of revenue growth and

25   paying user growth.  *E.g.*, ¶¶ 49, 50.  The Registration Statement's disclosures regarding these

26   metrics could not have been clearer.  Dropbox <u>repeatedly and prominently</u> disclosed that its rate

27   of revenue growth had declined.  For example, the Registration Statement twice stated: "***Our***

28   ***revenue growth rate has declined in recent periods and may continue to slow in the future.***"

RS at 17; *see also id.* at 4 (same statement in a "Risk Factors Summary").  Plaintiffs cannot base an omission claim on information that was plainly disclosed.  *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (dismissing claim where company had "disclos[ed] exactly what Plaintiffs claim" it omitted).  Dropbox also disclosed its historical revenue performance and growth in detail.  The <u>very first page</u> of the Registration Statement disclosed Dropbox's revenue in the three years leading to the IPO, which showed that Dropbox's revenue growth rates had declined.  RS at 1 ("Our revenue was $603.8 million, $844.8 million, and $1,106.8 million in 2015, 2016, and 2017, respectively, representing an annual growth rate of 40% and 31%, respectively.").  Elsewhere, Dropbox provided historical revenue performance on a quarterly basis for <u>eight quarters</u> preceding the IPO.  *Id.* at 80-81.  Any reasonable investor reviewing the Registration Statement could easily understand Dropbox's historical rates of revenue growth at the time of the IPO, including that it had been declining.  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1485 (N.D. Cal. 1992) (dismissing allegations that issuer failed to disclose that sales were "'boosted' by large one-time sales which would not recur" where "past sales trends [were] accurately and adequately disclosed" and analysts could "easily calculate [defendant's] historic sales and growth trends, and determine for themselves if any slowdown in historical growth is cause for concern."), *aff'd*, 11 F.3d 865 (9th Cir. 1993); *see also, e.g.*, *In re Skechers USA, Inc. Sec. Litig.*, No. 18 CIV. 8039 (NRB), 2020 WL 1233759, at *14 n.13 (S.D.N.Y. Mar. 12, 2020) (rejecting purportedly undisclosed trend where "any reasonable investor could have calculated the allegedly omitted trend"); *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (rejecting allegations based on failure to disclose number of subscription cancellations where the "number could be calculated through simple arithmetic using other numbers that were disclosed.").

        With respect to paying users, the Registration Statement likewise provided the exact information that plaintiffs claim Dropbox omitted:  namely, that Dropbox's historical growth rate in the number of paying users had decelerated at the time of the IPO.  Specifically, the Registration Statement disclosed that Dropbox's paying user metric grew from 6.5 million to 8.8 million (*i.e.*, by 2.3 million) from 2015 to 2016 and from 8.8 million to 11 million (*i.e.*, by 2.2

1  million) from 2016 to 2017.  RS at 14.  It likewise disclosed that the growth rate of paying users

2  had declined from 35% between 2015 and 2016 to 25% between 2016 and 2017.  *Id.* at 76, 78.

3  The Registration Statement warned that future results "could be harmed if we fail to attract new

4  users or convert registered users to paying users" and "[i]f we are not able to continue to expand

5  our user base or fail to convert our registered users to paying users, demand for our paid services

6  and our revenue may grow more slowly than expected or decline."  *Id.* at 16, 17.  Again, this is

7  disclosure of the very facts plaintiffs claim were omitted.  *See Steckman v. Hart Brewing, Inc.*,

8  143 F.3d 1293, 1296 (9th Cir. 1998) (affirming dismissal of complaint at pleading stage where

9  "the risks were completely disclosed"); *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d

10  Cir. 1996) (affirming dismissal where "[t]he prospectuses warn investors of exactly the risk the

11  plaintiffs claim was not disclosed"); *In Re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR,

12  2014 WL 5525946, at *12-13 (N.D. Cal. Oct. 31, 2014) (dismissing Section 11 allegations where

13  company made "comprehensive and specific disclosures").

14  **III.    NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE**

15          In light of Dropbox's disclosures regarding its slowing paying user and revenue growth

16  rates, the Court need go no further to dismiss the CAC.  Nevertheless, plaintiffs fail to state a

17  claim as to each of the challenged statements for the additional reasons set forth below.

18          **A.    Accurate Statements of Historic Paying User Results Are Not Actionable**

19          Plaintiffs allege that the following table, which provides the historical results of

20  Dropbox's paying users metric on an annual basis for the three years leading up to the IPO, was

21  misleading.  ¶ 56.

22

|  | As of December 31, | | |
|---|---|---|---|
|  | **2015** | **2016** | **2017** |
|  | *(In millions)* | | |
| Paying users | 6.5 | 8.8 | 11.0 |

23

24

25          Plaintiffs do not claim that the numbers in this table were false.  Instead, plaintiffs argue

26  that the numbers were misleading because they "provided investors with a materially false

27  understanding of the company's current and future prospects concerning user conversions . . . ."

28  ¶ 57.  That plaintiffs challenge this chart is quite remarkable given that the chart allowed any

1    investor to understand exactly what plaintiffs claim was omitted with simple arithmetic—*i.e.*,

2    that the paying user growth rate had decelerated at the time of the IPO.  *Supra* at 4, 11 (as

3    disclosed in the Registration Statement, year-over-year growth rate for paying users in the years

4    before the IPO was 35% (2015 to 2016) and 25% (2016 to 2017)); *Arfa v. Mecox Lane Ltd.*, No

5    10 Civ. 9053, 2012 WL 697155, at *6 (S.D.N.Y. Mar. 5, 2012) (dismissing alleged omission of

6    issuers' store closures where the registration statement disclosed a chart summarizing the

7    historical number of stores, from which a "simple comparison" revealed the alleged omission),

8    *aff'd*, 504 F. App'x 14 (2d Cir. 2012).

9          Setting that aside, plaintiffs' allegations violate well-settled law that the accurate

10   disclosure of historical results is not actionable.  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231,

11   1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even

12   if less favorable results might be predictable by the company in the future."); *see also Bodri v.*

13   *GoPro, Inc.*, 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) ("[T]he Court cannot conclude that any

14   reasonable investor would take the statements about past and present [pricing] as an objective

15   assurance of future [pricing] stability."); *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045,

16   1055 (N.D. Cal. 2016) ("[D]isclosures of accurate historical data accompanied by general

17   statements of optimism . . . are not actionable.") (quoting *VeriFone*, 784 F. Supp. at 1483).  This

18   provides another basis to dismiss plaintiffs' allegation regarding Dropbox's disclosure of past

19   paying users.

20        **B.     Opinions Regarding Registered User Characteristics Are Not Actionable**

21        Plaintiffs also claim that Dropbox's positive statements about the opportunity presented

22   by its registered user base of more than 500 million free and paid users were misleading.

23   Plaintiffs challenge the portion of the Registration Statement that described the opportunity this

24   user base presented:

25        We believe that our current registered user base represents a significant

26        opportunity to increase our revenue.  We estimate that approximately 300 million

27        of our registered users have characteristics—including specific email domains,

28        devices, and geographies—that make them more likely than other registered users

1   to pay over time.  Substantially all of our paying users share at least one of these

2   characteristics.

3   ¶ 58.

4       Plaintiffs allege that the above statement means "that Dropbox believed '300 million of

5   [its] registered users' <u>were likely to become paying users</u> which, based on the company's

6   historical 'average revenue per paying user' rates, amounted to revenue of approximately $33.3

7   billion."  ¶ 59 (emphasis added).  This allegation fails for three independent reasons: (i) plaintiffs'

8   inaccurate reading of the statement is facially unreasonable; (ii) the CAC pleads no facts that

9   would render this opinion statement actionable; and (iii) it is a forward-looking statement that was

10  accompanied by meaningful cautionary language and, therefore, immunized by the bespeaks

11  caution doctrine.

12      This Court should not countenance plaintiffs' implausible interpretation of the challenged

13  statement.  *See, e.g.*, *West v. eHealth, Inc.*, No. 3:15-CV-00360-JD, 2016 WL 948116, at *5 (N.D.

14  Cal. Mar. 14, 2016) (rejecting "interpretations of the statements that are taken out of context and

15  are not plausible on [their] face."); *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal.

16  2019) (holding that plaintiffs failed to state a securities claim where they asked "the Court to make

17  inferences contradicted by the statements viewed properly as a whole").  Contrary to plaintiffs'

18  allegation, Dropbox <u>did not</u> claim that it believed that <u>all</u> 300 million registered users with one or

19  more favorable characteristics were likely to become paying users.  Instead, Dropbox clearly

20  stated that it believed that the 300 million users had characteristics that made them "<u>more likely</u>

21  <u>than other registered users</u>" to pay over time.  RS at 64.  Plaintiffs selectively ignore this critical

22  language.  ¶ 59.  But plaintiffs cannot use "selective quotes to deprive statements of their context."

23  *See, e.g.*, *Lu*, 417 F. Supp. 3d at 1276 (plaintiffs cannot "cherry-pick[] portions of Defendants'

24  statements and ignor[e] other portions"); *In re Ocera Therapeutics, Inc. Secs. Litig.*, No. 17-CV-

25  06687-RS, 2018 WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018) ("Plaintiffs must account for the

26  entirety of public filings on which they rely, and not simply invoke selective quoting to make their

27  claims.").  Once that language is considered, the meaning of the statement is perfectly clear.  It

28  conveyed Dropbox's belief that one group of users (who had certain characteristics) was more

likely than another group of users (who did not) to become paying users over time.  The statement said nothing about how many of the approximately 300 million users would (or were likely to) become paying users or when the conversions would occur.  Nor did Dropbox make any representation about how much revenue would ultimately be obtained from those users, as plaintiffs claim.  Such an open-ended statement cannot possibly be interpreted as an actionable guarantee.  *E.g.*, *Or. Pub. Empls. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606-07 (9th Cir. 2014) (affirming dismissal; subjective statements that are stated in "general terms" and involve qualifiers such as "we believe" are not actionable); *see also Skechers*, 2020 WL 1233759, at *8 (statements regarding "management's predictions and opinions" about future trends involving debt leverage were not actionable where they did "not promise or guarantee the investors to achieve any specific level of leverage by any specific point of time").

Plaintiffs' allegations also fail for another reason.  Dropbox's statement—that "[w]e believe that our current registered user base represents a significant opportunity to increase our revenue"—is a quintessential opinion statement.  RS at 4, 64, 104 (emphasis added); *see also id.* at 47 ("[S]tatements that 'we believe' and similar statements reflect our beliefs and opinions on the relevant subject."); *Omnicare*, 575 U.S. at 186 ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."); *Align*, 856 F.3d at 615 (holding that an opinion statement with no embedded facts is actionable "only if the speaker does not honestly hold the stated belief and the belief is objectively incorrect").  Under the Supreme Court's *Omnicare* decision and its Ninth Circuit progeny in *Align*, opinion statements are only actionable in three narrow circumstances:  where (i) "the speaker did not hold the belief she professed"; (ii) "the supporting fact[s] [the speaker] supplied [are] untrue"; or (iii) the opinion omitted information that rendered the opinion misleading.  *Align*, 856 F.3d at 615 (citing *Omnicare*, 575 U.S. at 185-86, 194).

Plaintiffs do not attempt to meet their burden to show Dropbox's statements of opinion are actionable.  Plaintiffs do not (and cannot) claim that Dropbox did not subjectively believe its opinion under the first prong of *Omnicare*.  *Id.*  Plaintiffs likewise do not claim that any of the factual statements supporting the opinion were false under the second *Omnicare* prong.  For

example, plaintiffs do not dispute that "substantially all of [Dropbox's] paying users share[d] at least one of [the enumerated] characteristics" or that Dropbox did, in fact, have approximately 300 million registered users that had one or more of those characteristics.  RS at 64.  Indeed, plaintiffs do not even dispute that the users that had one or more of the characteristics converted at a higher rate than the ones that did not.  Plaintiffs' claims likewise fall far short under an omissions theory as set forth in the third *Omnicare* prong.  Such a claim requires plaintiffs to allege "particular (and material) facts" about the basis of the opinion, *i.e.*, "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" that, due to their omission, rendered the opinion "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194 (emphasis added).  Of course, plaintiffs have not offered a single fact, much less particularized and material facts, going to Dropbox's knowledge or its inquiry supporting its opinion.  *Id.*  In fact, as demonstrated by plaintiffs' facially incorrect interpretation of the statement, plaintiffs do not even bother to read Dropbox's opinion statement "fairly and in context," as they must.  *Id.*

Finally, Dropbox's opinion statement was forward looking—*i.e.*, it reflected Dropbox's opinion about the future opportunity Dropbox's registered user base represented, which was itself based on an "estimate" that certain users were "more likely than other registered users to pay over time." RS at 4 (emphasis added); *see also id.* at 46 (identifying statements about ability to "convert registered users to paying users" as forward looking).  Forward looking statements are immunized under the "bespeaks caution" doctrine where they are accompanied by specific warnings of potential risks. *Stac Elecs.*, 89 F.3d at 1408-09 (dismissing Section 11 allegations; applying bespeaks caution doctrine "that investors were specifically and adequately cautioned about the relevant risks").  Here, as noted above, Dropbox warned that its growth could be harmed if it failed to convert free users to paying users.  RS at 2, 16.  Further, the Registration Statement cautioned investors that although Dropbox "served over 500 million registered users," it had "only 11 million paying users" and that "[a] majority of our registered users may never convert to a paid subscription to our platform." *Id.* at 16 (emphasis added).  These are exactly the kind of cautionary statements that courts have repeatedly held immunize forward-looking

1    statements from liability.  *E.g.*, *Belodoff v. Netlist, Inc.*, No. SA CV 07-00677 DOC (MLGx),

2    2008 WL 2356699, at *9 (C.D. Cal. May 30, 2008) (dismissing Section 11 claims; risk factors

3    cautioning of the possibility of sales declines to major customers immunized statement that

4    major customers were "expect[ed] . . . to represent a significant percentage of our net sales"); *In*

5    *re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1089 (C.D. Cal. 2003) (dismissing

6    Section 11 claim; risk factors cautioning that platform adoption was not assured immunized

7    statements about platform migration).

8        **C.    Plaintiffs' Allegations Regarding User Cohorts Are Not Actionable**

9        Plaintiffs claim that Dropbox's positive statements about its user cohorts presented a

10   misleadingly optimistic picture of Dropbox's growth opportunity.  This allegation is also without

11   merit.  Dropbox tracks the revenue generated by each group of registered users who sign up in a

12   given time period.  RS at 65.  Dropbox refers to these groups of users as "cohorts."  As a result

13   of Dropbox's efforts to increase its number of paying users and the revenue each paying user

14   generates, cohorts typically generate more revenue over time.  *Id.*  For example, the monthly

15   revenue generated by the January 2015 cohort doubled in less than three years after signup.  *Id.*

16   at 66.  In addition, later-in-time user cohorts typically generate more monthly subscription

17   revenue sooner than earlier cohorts did, as demonstrated by the fact that users in the January

18   2017 cohort generated more monthly subscription revenue than users in the January 2016 cohort

19   when compared at the same points in time after the respective cohorts signed up for Dropbox.

20   *Id.* at 67.

21       In the CAC, plaintiffs allege that the following statements were misleading:

22   • "[E]ach cohort of new users typically generates higher subscription amounts over time

23       . . . ." ¶ 61.

24   • "[T]he monthly subscription amount generated by the January 2015 cohort doubled in

25       less than three years after signup . . . ." *Id.*

26   • "[A]t virtually every point in time after signup, the January 2017 cohort generated a

27       higher monthly subscription amount than the January 2016 cohort, which in turn

28

1    generated a higher monthly subscription amount than the January 2015 cohort . . . ."

2    *Id.*

3    • "We believe [the January 2015] cohort is representative of a typical cohort in recent

4    periods . . . ." *Id.*

5        Plaintiffs claim that these statements "represented to investors that Dropbox was

6  excelling in terms [of] revenue growth and subscription sales and poised for substantial progress

7  in terms of user-conversions and earnings going forward." ¶¶ 61-62.  Plaintiffs also allege that

8  the statements above, taken together with Dropbox's illustrative charts, were misleading because

9  "Dropbox's statements about its past progress in terms of user-conversions and subscription

10  revenue were not indicative of current and/or future results." ¶ 62.

11        As an initial matter, Dropbox <u>was</u> (and still is) excelling in terms of revenue and paying

12  user growth.  As reflected in the chart above, Dropbox's revenue and paying users grew in every

13  quarter before the IPO and have grown in every quarter since. *See supra* at 6.  Moreover,

14  plaintiffs do not allege that the first three challenged statements above—which are merely factual

15  statements regarding the revenue performance of historical user cohorts—are false.  Again, it is

16  black-letter law that accurate statements of historical fact such as the challenged statements are

17  not representations of future performance and are not actionable under Section 11. *E.g.*, *Wenger*,

18  2 F. Supp. 2d at 1245; *supra* at 12.

19        The fourth challenged statement—*i.e.*, "[w]e believe [the January 2015] cohort is

20  representative of a typical cohort in recent periods"—is, as previously explained, an opinion

21  statement.  Plaintiffs do not allege this opinion turned out to be incorrect, nor do they plead any

22  other facts sufficient to satisfy their pleading burden under *Omnicare* and *Align*. *See supra* at

23  14-15.  Further, because the statement is a prediction that January 2015 cohort would be

24  representative of more recent cohorts, it is a forward-looking statement immunized by the

25  bespeaks caution doctrine. *See supra* at 15-16.  Because it was accompanied by specific

26  cautionary language—*e.g.*, "our future growth could be harmed if we fail to attract new users or

27  convert registered users to paying users," and "[a] majority of our registered users may never

28  convert to a paid subscription"—it is not actionable. *Id.*

1    **IV.    PLAINTIFFS HAVE NOT STATED A CLAIM UNDER ITEM 303**

2            Plaintiffs also fail to plead that Dropbox violated a disclosure duty under Item 303(a)(3)

3    of Regulation S-K by not disclosing a decline in the rate of converting free users to paying users.

4    ¶¶ 54, 57.  In general, Item 303 requires disclosure of "known trends or uncertainties that have

5    had or that the registrant reasonably expects will have a material favorable or unfavorable impact

6    on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303.  Under

7    Item 303, plaintiffs must "allege facts showing defendants knew of an adverse trend, the material

8    impact of that trend, and 'that the future material impacts are reasonably likely to occur from the

9    present-day perspective.'"  *Belodoff*, 2009 WL 2777320, at *12 (quoting *Steckman*, 143 F.3d at

10   1297-98); *see also Welgus II*, 2017 WL 6466264, at *18 (same).  Here, the CAC fails to plead

11   any facts regarding conversion rates at all, much less facts to show there was any such

12   conversion rate "trend" to disclose.  *Welgus II*, 2017 WL 6466264, at *18 (dismissing Item 303

13   allegation where complaint did not include factual allegations regarding alleged known trends

14   and uncertainties).  Plaintiffs also do not plead any non-conclusory facts regarding Dropbox's

15   knowledge of any "trend."  *See J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 391-92

16   (6th Cir. 2008) (affirming dismissal for failing to plead knowledge); *Mallen v. Alphatec*

17   *Holdings, Inc.*, No. 10-CV-1673-BEN MDD, 2013 WL 1294640, at *12-13 (S.D. Cal. Mar. 28,

18   2013) (dismissing complaint for failure to plead knowledge), *aff'd sub nom. Fresno Cty. Emps.*

19   *Ret. Ass'n. v. Alphatec*, 607 F. App'x 694 (9th Cir. 2015).  Plaintiffs offer no allegation

20   whatsoever regarding any defendant's purported knowledge of conversion rates.

21           Even if plaintiffs had alleged facts showing the rate at which Dropbox was converting

22   users to paid users had declined, their Item 303 claim would still fail because they do not explain

23   how this alleged "trend" had, or was likely to continue to have, a materially adverse impact on

24   Dropbox' revenue.  In fact, user conversion is only one aspect of Dropbox's overall revenue.  As

25   explained above, Dropbox could grow revenue by adding paying users who did not initially sign

26   up for its free product or by increasing ARPU.  *Supra* at 3-4.  Without any particularized facts

27   showing that slowing conversion rates had materially impacted Dropbox's revenue and future

28   impacts were reasonably likely to occur, plaintiffs cannot meet their burden to plead an Item 303

1  violation.  *Fresno Cty.*, 607 F. App'x at 695 (affirming dismissal of Item 303 allegations where

2  plaintiff did not explain how alleged trend "factored into . . . revenue projections").

3  **V.      PLAINTIFFS' CLAIMS ARE TIME-BARRED**

4          Dismissal without leave to amend is particularly appropriate here because plaintiffs'

5  Section 11 claim is time-barred, given that plaintiffs were on notice of the facts underlying their

6  claims over a year before they filed their initial complaint on October 4, 2019.  ECF No. 1;

7  15 U.S.C. § 77m (a Section 11 claim must be brought "within one year after the discovery of the

8  untrue statement or the omission, or after such discovery should have been made by the exercise

9  of reasonable diligence").  The one-year period begins to run once the plaintiff discovers the

10 facts constituting the violation, or once a reasonably diligent plaintiff would have discovered the

11 facts constituting the violation, whichever comes first.  *Merck & Co. v. Reynolds*, 559 U.S. 633,

12 646-47 (2010); *see also Welgus*, 2017 WL 167708, at *20 n.10 (holding that the discovery rule

13 articulated in *Merck* applies to the statute of limitations for Section 11 claims).  The discovery of

14 a fact occurs when a "reasonably diligent plaintiff would have sufficient information about that

15 fact to adequately plead it in a complaint . . . ."  *Welgus*, 2017 WL 167708, at *20 (citations

16 omitted); *see also F.D.I.C. v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP, 2012 WL

17 5900973, at *3 (C.D. Cal. Nov. 21, 2012) (quoting *City of Pontiac Gen. Emps.' Ret. Sys v.

18 MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)) (same).  Once a reasonably diligent plaintiff

19 would have been on notice of a claim, the disclosure of additional information does not reset the

20 statute of limitations.  *Welgus*, 2017 WL 167708, at *22 (recognizing that "the one-year time

21 period does not reset simply because additional information is revealed that could make for a

22 stronger claim.") (citation omitted).

23         Plaintiffs' Section 11 claim is time-barred because they were on notice of it well more

24 than one year before they filed their complaints on October 4, 2019.  ECF No. 1.  In fact, as

25 explained above, the Registration Statement itself disclosed slowing rates of revenue and paying

26 user growth.  *Supra* at 9-10; *see also Rudman v. CHC Grp. LTD*, 217 F. Supp. 3d 718, 724

27 (S.D.N.Y. 2016) (concluding statute of limitations was triggered where purportedly concealed

28 "fact was largely obvious from disclosures in the Registration Statement itself").  If that were not

enough, Dropbox's quarterly announcements of post-IPO results triggered the statute of limitations period, at the latest, by August 10, 2018—more than <u>13 months</u> before plaintiffs filed their complaints.  By that date, Dropbox had disclosed results for two more quarters (Q1'18 and Q2'18).  Thus, by August 10, 2018, and with the Registration Statement, Dropbox had reported 18 quarters of revenue and three and a half years of paying users, from which any reasonably diligent plaintiff could easily calculate Dropbox's growth rates.  *See* Ex. 2 at 6, 30; Ex. 3 at 6, 31; *see supra* at 10-11.  Plaintiffs' untimely assertion of their claims supports dismissal with prejudice.  *Welgus*, 2017 WL 167708, at *21 (dismissing with prejudice claims as time barred where issuer disclosed "the information that plaintiffs claim should have been disclosed"); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 915 (N.D. Cal. 2015) (same).

## VI.    PLAINTIFFS' SECTION 15 CLAIM FAILS

Finally, plaintiffs fail to state a Section 15 claim for control person liability.  *See* 15 U.S.C. § 77o.  To state a Section 15 claim, a plaintiff must plead an underlying primary violation.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).  Because plaintiffs have failed to plead a Section 11 claim (and because their Section 11 claim is time-barred), their Section 15 claim necessarily fails.  *Id.*; *see also Greenberg*, 233 F. Supp. 3d at 772.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice and without leave to amend.

Dated:  April 16, 2020

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Nina F. Locker*
      Nina F. Locker

*Attorneys for Defendants Dropbox, Inc., Andrew W. Houston, Ajay V. Vashee, Timothy J. Regan, Arash Ferdowsi, Robert J. Mylod, Jr., Donald W. Blair, Paul E. Jacobs, Condoleezza Rice, R. Bryan Schreier, and Margaret C. Whitman*