1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

IN RE DROPBOX SECURITIES

LITIGATION

Case No.  19-cv-06348-BLF

**ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND**

[Re:  ECF 71, 73]

7

8   Lead Plaintiff Ognjen Kuraica represents a putative class of investors who purchased or

9   otherwise acquired the common stock of Dropbox, Inc. ("Dropbox") pursuant or traceable to the

10   Registration Statement associated with its Initial Public Offering ("IPO"). Consolidated Amended

11   Complaint ("CAC") at ¶¶ 1-2.

12   Plaintiffs' complaint forwards various securities violations against four groups of

13   defendants (collectively, "Defendants"): Dropbox; Andrew W. Houston, Ajay V. Vashee, Timothy

14   J. Regan, Arash Ferdowsi, Robert J. Mylod, Jr., Donald W. Blair, Paul E. Jacobs, Condoleezza

15   Rice, R. Bryan Schreier, and Margaret C. Whitman (collectively, the "Registration Statement

16   Defendants"); Sequoia Capital XII, L.P., Sequoia Capital XII Principals Fund, LLC, Sequoia

17   Technology Partners XII, L.P., and SC XII Management, LLC (collectively, the "Sequoia

18   Defendants"); and Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Deutsche Bank

19   Securities Inc., BofA Securities, Inc. (f/k/a Merrill Lynch, Pierce, Fenner Smith Incorporated),

20   Allen Company LLC, RBC Capital Markets, LLC, Jefferies LLC, Macquarie Capital (USA) Inc.,

United States District Court
Northern District of California

1   Canaccord Genuity LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Piper Sandler

2   & Co. (f/k/a Piper Jaffray Co.) (collectively, the "Underwriter Defendants"). *See* CAC at ¶¶ 12-34

3   (describing Defendants).

4        On April 16, 2020, Dropbox and the Registration Statement Defendants moved to dismiss

5   the litigation under Fed. R. Civ. P. 12(b)(6). ECF 71. The Underwriter Defendants filed a joinder

6   to that motion, ECF 74, and the Sequoia Defendants filed a joinder and a separate motion to

7   dismiss, ECF 73. For the reasons discussed below and at the September 24, 2020 hearing, the

8   Court GRANTS both motions WITH LEAVE TO AMEND.

9   **I.     BACKGROUND**

10       Dropbox provides users with cloud-based storage and collaboration services on a free and

11  paid subscription basis. CAC ¶¶ 35-36. In preparation for its IPO, Dropbox filed its Form S-1

12  Registration Statement with the Securities Exchange Commission. ECF 72 at Ex. 1

13  ("Registration Statement" or "RS"). The Registration Statement was declared effective on March

14  22, 2018. *Id*.

15       The Registration Statement disclosed that Dropbox had more than 500 million registered

16  users, RS at 1, and generated revenue from users who purchase subscription products, RS at 62-

17  64 ("Our Subscription Plans"). Only 11 million Dropbox users were paying users at the time of

18  the filing. RS at 1, 61. The Registration Statement explained that Dropbox's business model was

19  premised on three core factors: (1) new user sign ups (whether free or paying), (2) increasing the

20  conversion of free users to paying users, and (3) upgrading and expanding the subscriptions used

21  by existing paying users. RS at 4-5 ("Our Growth Strategy"), 64-65 ("Our Business Model"). It

22  highlighted numerous risk factors that its business model was subject to, to include:

23
24       - Our business depends on our ability to retain and upgrade paying users, and any
         decline in renewals or upgrades could adversely affect our future results of
25       operations.
26       - Our future growth could be harmed if we fail to attract new users or convert

2

registered users to paying users.

- Our revenue growth rate has declined in recent periods and may continue to slow in the future.

RS 5. The Registration Statement detailed historical performance metrics, to include revenue, paying users, and average revenue per paying user ("ARPU"). RS at 1, 76, 78, 81 (revenue); RS at 14, 76, 78 (paying users); RS at 14, 70 (ARPU). Dropbox noted that its revenue growth was primarily based on its growth in paying users, but was also tied to ARPU. *See* RS 76, 78, 81. Dropbox did not disclose any metrics about the rate at which it converted free users into paid users ("user conversion rate") in its Registration Statement or elsewhere.

On March 23, 2018, Dropbox completed its IPO, issuing over 26 million shares of common stock and generating over $500 million. CAC ¶ 39. The next day, the Underwriter Defendants exercised their option to purchase an additional 5.4 million shares. CAC ¶ 40. Before and after the IPO, the Sequoia Defendants "controlled 25% of the voting shares of Dropbox and were in league with other large shareholders and company insiders to further increase their control over Dropbox and its affairs." CAC ¶ 28. In each quarter following the IPO, Dropbox announced that its revenue and paying userbase had increased. *See* ECF 72 at Exhs. 2-9 (Form 10-Q for 1Q'18 through 3Q'19 and Form 10-K for fiscal year 2019).

Plaintiffs filed their initial complaint on October 4, 2019. ECF 1. In their CAC, filed March 2, 2020, Plaintiffs raised claims under Section 11 of the Securities Act against Dropbox, the Registration Statement Defendants, and the Underwriter Defendants and under Section 15 of the Securities Act against the Registration Statement Defendants and the Sequoia Defendants. CAC ¶¶ 63-80. Plaintiffs allege that the Registration Statement failed to disclose "that the rate at which Dropbox was converting its non-paying registered users to paying subscription users was decelerating," causing Dropbox "to experience a material decline and/or slowdown in revenue growth." CAC at ¶ 3. Plaintiffs further allege that had Dropbox disclosed information about this

United States District Court
Northern District of California

declining user conversion rate, they "would not have purchased Dropbox's stock at the prices they did (if at all)." CAC ¶¶ 3-4.

To support this theory, Plaintiffs highlight three sets of statements in Dropbox's Registration Statement that they believe run afoul of securities law (hereinafter, "Paid Users Statement," "Conversion Characteristics Statement," and "Cohort Statements"). *See* CAC ¶¶ 56-62.

*Paid Users Statement*: First, in Dropbox's "Prospectus Summary," the company provided a table summarizing the number of users who paid for its services from 2015-17:

|  | *2015* | *2016* | *2017* |
|---|---|---|---|
| *Paying users* | 6.5 million | 8.8 million | 11.0 million |

CAC ¶ 56. Plaintiffs alleged that this chart "was materially misleading in light of the fact that at the time of the IPO the company was materially decelerating in terms of converting its non-paying registered users to paying subscription users." It argued that by omitting information about the conversion rate, "Dropbox provided investors with a materially false understanding of the company's current and future prospects concerning user conversions" and "failed to disclose a material and negative trend in violation of Item 303 of Regulation S-K." CAC ¶ 57.

*Conversion Characteristic Statement*: Plaintiffs next point to a section within the Registration Statement titled "Growth Strategy":

> We believe that our current registered user base represents a significant opportunity to increase our revenue. We estimate that approximately 300 million of our registered users have characteristics—including specific email domains, devices, and geographies—that make them more likely than other registered users to pay over time. Substantially all of our paying users share at least one of these characteristics.

United States District Court
Northern District of California

CAC ¶ 58. Plaintiffs contend that because "Dropbox's user-conversion and revenue were flagging," this statement was rendered "materially misleading because it had become increasingly unlikely that the '300 million' registered users would convert to paying users." CAC ¶ 59.

*Cohort Statements:* Plaintiffs highlight a section titled "Our Attractive Cohort Economics" within "Management's Discussion and Analysis." The section in its entirety reads:

> We define a cohort as all registered users who signed up for Dropbox in a given period of time. We track the total monthly subscription amount of all paying users in each cohort as of the end of the month, or the monthly subscription amount. For paying users who opt for our monthly plans, the monthly subscription amount is equal to the price of the monthly plan. For paying users who opt for our annual plans, which a majority of our users do, the monthly subscription amount is equal to the price of the annual plan divided by twelve. These amounts increase as more registered users in each cohort convert to paying users, paying users upgrade to premium subscription offerings, and team administrators purchase additional licenses. These amounts decrease when paying users terminate their subscriptions, downgrade their subscriptions to a lower tier, or team administrators reduce the number of licenses on their subscription plans. We continuously focus on adding new users and increasing the value we offer to them. As a result, each cohort of new users typically generates higher subscription amounts over time.

> The chart below reflects the monthly subscription amount from January 2013 to December 2017 of all paying users in each quarterly cohort, including those who signed up for our platform prior to 2013.

United States District Court
Northern District of California



## Monthly subscription amount
### By quarterly cohort

We continuously focus on adding new users and increasing the value we offer to them. As a result, each cohort of new users typically generates higher subscription amounts over time. For example, the monthly subscription amount generated by the January 2015 cohort doubled in less than three years after signup. We believe this cohort is representative of a typical cohort in recent periods.

Moreover, as we continue to innovate and optimize our go-to-market strategy, we have successfully increased monetization for subsequent cohorts. Comparing January cohorts from the last three years, at virtually every point in time after signup, the January 2017 cohort generated a higher monthly subscription amount than the January 2016 cohort, which in turn generated a higher monthly subscription amount than the January 2015 cohort.



## Monthly subscription amount
### Indexed to month 1 of January 2015 cohort

United States District Court<br>Northern District of California

1

2 CAC ¶ 60. Plaintiffs reason that this section "falsely represented that Dropbox's historical user-

3 conversions and subscription revenue was indicative of current and future results."

4 **II. LEGAL STANDARD**

5   "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

6 claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation*

7 *Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

8 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as

9 true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.

10 *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court

11 need not "accept as true allegations that contradict matters properly subject to judicial notice" or

12 "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

13 inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation

14 marks and citations omitted). While a complaint need not contain detailed factual allegations, it

15 "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

16 on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

17 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the

18 reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

19 **III. DISCUSSION**

20  **A. Judicial Notice**

21   A court generally cannot consider materials outside the pleadings on a motion to dismiss

22 for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). A court may, however, consider items of

23 which it can take judicial notice without converting the motion to dismiss into one for summary

24 judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). A court may take judicial notice

25 of facts "not subject to reasonable dispute" because they are either "(1) generally known within

United States District Court
Northern District of California

7

the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. A court may additionally take judicial notice of " 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.2001) (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986)). Under the incorporation by reference doctrine, courts may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994)) (alteration in original).

Defendants seek notice of ten exhibits: Dropbox's Registration Statement (Exh. 1), Form 10-Q for 1Q'18-3Q'19 (Exhs. 2-8), Form 10-K for the 2019 fiscal year (Exh. 9), and a copy of Dropbox stock prices from March 23, 2018, to August 8, 2019, as obtained from Yahoo! Finance (Exh. 10). ECF 71 at 7-8; *see* ECF 72 (exhibits). Plaintiffs do not oppose this request "to the extent that the Court takes notice of the fact that statements contained in those documents were made" but oppose it if "Defendants attempt to use these exhibits to defeat Plaintiffs' adequately pleaded claims" as such practice is disfavored by the Ninth Circuit. ECF 80 at 8. Plaintiffs also request that the Court take judicial notice of a financial analyst report referenced by the CAC. ECF 80 at 8.

The Court grants judicial notice of Dropbox's Registration Statement and the financial analyst report under the incorporation by reference doctrine. *See* CAC ¶¶ 1 fn. 1, 52. It also takes judicial notice of the SEC Filings and the copy of Dropbox's stock prices. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (granting judicial notice of publicly available financial documents such as SEC filings); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (granting judicial notice of publicly available articles or other news releases of which the market was aware). The Court considers these documents for

8

the sole purpose of determining what representations Dropbox made to the market. The Court does not take notice of the truth of any of the facts asserted in these documents. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *23 (N.D. Cal. Dec. 17, 2019)

### B.  Section 11 of the Securities Act

"Section 11 creates a private right of action for any purchaser of a security where 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 914 (N.D. Cal. 2015) (quoting 15 U.S.C. § 77k(a)). "To prevail on a Section 11 claim, a plaintiff must demonstrate (1) that the registration statement contained a misrepresentation or omission; and (2) that the misrepresentation or omission was material." *Id*. (citing *In re Daou Sys.*, 411 F.3d 1006, 1027 (9th Cir. 2005). A misrepresentation or omission is material where it "would have misled a reasonable investor about the nature of his or her investment." *In re Daou*, 411 F.3d at 1027. "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *Id.*

Defendants argue Plaintiffs' overall theory of liability fails because, among other things, "the CAC has no factual allegations regarding user conversion." ECF 71 at 8. Plaintiffs organize their response by statement set. They contend that the Conversion Characteristic Statements "created the false and misleading impression that Dropbox's growth of user conversions was not declining or slowing down." ECF 80 at 9. Similarly, they argue that Dropbox's Cohort Statements "materially misled Plaintiffs about Dropbox's operations because it omitted the fact that the Dropbox's user conversion rate was dropping." ECF 80 at 13-14. Finally, they contend that the Paid Users Statements were misleading because "[d]isclosing the total number of paid users increasing as of each calendar year created a misleading impression that the Company's rate of converting registered users to paying users was also growing." ECF 80 at 14.

The Court has run a fine-tooth comb through the Plaintiffs' CAC and cannot find a single factual allegation about Dropbox's user conversion rate. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001) (the Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"); *Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *11 (C.D. Cal. Apr. 17, 2009) (dismissing Section 11 allegations where plaintiffs made "no factual showing whatsoever" regarding the alleged omission); *cf. Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *13 (N.D. Cal. Jan. 17, 2017) (rejecting control person allegations under Section 15 of the Securities Act as "too conclusory" in the absence of "any facts to show that [the defendant] had the power to and did control the [issuers'] activities"). This is an elephant-sized hole in Plaintiffs' theory of liability as its entire complaint is premised on the alleged decline of Dropbox's user conversion rate. Indeed, Dropbox itself noted that this is not a metric it releases. ECF 71 at 9. In short, Plaintiffs' assertion that Dropbox's user conversion rate was declining is nothing more than speculation. Unfortunately, Plaintiffs spend most of their persuasive energy discussing the actionability of the statement at issue instead of responding to the global flaws highlighted by Defendants. *See, e.g.,* ECF 80 at 2, 9-14.

In the few areas where they do offer factual allegations, Plaintiffs seem to conflate user conversion rate with paying user and revenue growth rates. For example, Plaintiffs contend that "Dropbox's disclosures that its business model was largely based on converting registered users to paying users (RS at 68) and that over 90% of its revenue came from users purchasing subscriptions through the app or website (¶ 44)." ECF 80 at 5. As the Court noted above, one of Dropbox's *three* main revenue sources was from converting free users into paid users. And the Plaintiffs' focus on the 90% metric misses the mark as it does not speak to what part of Dropbox's revenue came from converting already-signed-up free users into paid users. Similarly, Plaintiffs include two charts that they believe illustrate "the [declining] rate at which Dropbox was

United States District Court
Northern District of California

converting its nonpaying registered users." ECF 80 at 5. However, the charts instead depict Dropbox's declining paying user and revenue growth rates—both of which Dropbox disclosed in its Registration Statement. ECF 80 at 6. *See McGovney v. Aerohive Networks*, Inc., 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (dismissing Section 10(b) where company "disclos[ed] exactly what Plaintiffs claim" it omitted); *see, e.g.*, RS 1 (yearly revenue and growth rate), 14 (yearly paying users), 76 (yearly revenue, paying user growth rate), 78 (same), 80 (quarterly revenue); 81 (same).

To the extent this conflation is actually an invitation for the Court to use disclosed statistics to make an assumption about the user conversion rate, the Court declines. It is equally plausible that Dropbox's revenue rate decline could be traced to Dropbox's other two revenue drivers or to some combination of all three metrics. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true." (citations omitted)). In *Belodoff v. Netlist*, plaintiffs brough a Section 11 claim against a technology manufacturer alleging that it failed to disclose "a significant decline in customer demand." 2009 WL 1293690, at *11. However, the only express statement plaintiffs alleged about this "dwindling customer demand" concerned excessive inventory levels. The Court declined to infer a decrease in customer demand from the excess inventory levels because the "inference lack[ed] factual support and actually contradict[ed] portions of the FAC that allege[d] that Netlist was creating excess inventory without any regard to customer demand." *Id*. As such, the claim "[did] not rise above the speculative level." *Cf. Welgus*, 2017 WL 167708, at *13 (refusing to draw an inference regarding control person liability when allegations were based on "speculation"). So too here.

United States District Court
Northern District of California

1        Although the insufficiency of Plaintiffs' pleadings about Dropbox's user conversion rate is

2  fatal to the Section 11 claims, the Court addresses an additional flaw. For Plaintiffs to state an

3  omission-based Section 11 claim, it is not enough that the Registration Statement omitted relevant

4  or material facts. *See In re Rigel Pharm., Inc. Sec. Lit.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012)

5  (citing *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 38 (2011)); *Brody*, 280 F.3d at 1006.

6  Instead an omission "must affirmatively create an impression of a state of affairs that differs in a

7  material way from the one that actually exists" to be actionable. *Brody*, 280 F.3d at 1006.

8  Plaintiffs' lawsuit is largely predicated on Dropbox's omission of allegedly declining user

9  conversion rate in its Registration Statement. *See* CAC ¶¶ 53, 54, 57, 59, 62.

10       Defendants argue that "Dropbox was not required to disclose its free-to-paid user

11  conversion numbers because that number was subsumed within the total number of paying users,

12  which Dropbox did disclose." ECF 71 at 8-9. They also argue that, in light of this disclosure,

13  "Dropbox had no duty to disclose any further detail about free-to-paid user conversions" because

14  "[t]he Ninth Circuit has 'expressly declined to require a rule of completeness for securities

15  disclosures because "[n]o matter how detailed and accurate disclosure statements are, there are

16  likely to be additional details that could have been disclosed but were not."'" ECF 71 at 9

17  (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1061 (9th Cir.

18  2014) (quoting *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir.2002))). Plaintiffs

19  appear to generally contend that the three sets of statements created a false and misleading

20  impression that Dropbox's growth of user conversions was not slowing down. *See, e.g.*, ECF 80 at

21  9.

22       The Court agrees with Dropbox. Plaintiffs fail to explain why Dropbox's omission of its

23  allegedly flagging user conversion rate created an "impression of a state of affairs that differs in a

24  material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Dropbox's state of

25  affairs is defined by its three-prong business model of (1) attracting new users (free or paid), (2)

converting free users to paid users, and (3) upgrading paid user subscriptions. The success of the model is captured through Dropbox's total number of paid users, its total revenue, and ARPU. Dropbox explained and published these metrics in its Registration Statement. And despite the fact that it disclosed revenue growth metrics, it also explicitly stated that its revenue growth rate had begun to decline. While the metric Plaintiffs are fixated on, user conversion rate, was not explicitly disclosed by Dropbox, it was captured by the total number of paid users, a metric regularly disclosed by Dropbox. Plaintiffs do not explain why these disclosures are insufficient, let alone why they are so insufficient as to create a materially different impression of Dropbox's financial health. *See In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (rejecting allegations based on failure to disclose number of subscription cancellations where the "number could be calculated through simple arithmetic using other numbers that were disclosed."); *see also Brody*, 280 F.3d at 1006 n.8 (where a company makes a disclosure about sales growth, it need not provide "a detailed breakdown of the company's region by region or month by month sales."). Plaintiffs also fail to allege facts showing how Dropbox's truthful disclosures of declining revenue and paid user rates could plausibly infer that one of the three contributors to that disclosure was, in fact, increasing. Without further detail, the only plausible inference is that all three indicators were declining. Plaintiffs' theory would be a fantastical view that Dropbox's disclosure of declining rates caused a reasonable investor to conclude that one of the three indicators that makes up the disclosed declining rate was actually increasing when it was not.

Although not necessary to this Order, the Court also briefly addresses the Defendants' argument that the statements at issue are not actionable because they are accurate statements of historical fact or statements of opinion. *See* ECF 71 at 11-17. Courts in this district have repeatedly refused to find disclosure of accurate historical data misleading. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not

become misleading even if less favorable results might be predictable by the company in the future."); s*ee also Bodri v. GoPro, Inc*., 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) ("[T]he Court cannot conclude that any reasonable investor would take the statements about past and present [pricing] as an objective assurance of future [pricing] stability."); *Monachelli v. Hortonworks, Inc*., 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) ("[D]isclosures of accurate historical data accompanied by general statements of optimism . . . are not actionable.") (quoting *In re VeriFone Sec. Litig*., 784 F.Supp. 1471, 1483 (N.D. Cal. 1992)). Plaintiffs do not allege that any of Dropbox's statements at issue are false, but rather insist that they created a misleading impression that Dropbox's user conversion growth rate was not declining. *See, e.g.,* ECF 80 at 13 (Cohort Statements), 14 (Paid Users Statement). But Plaintiffs fail to allege any facts that directly—or even indirectly—undermine these statements.

Plaintiffs fare no better in showing that Dropbox's User Characteristics Statement is actionable. Under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), opinion statements are only actionable where (1) "the speaker did not hold the belief she professed," (2) "the supporting fact[s] [the speaker] supplied [are] untrue," or (3) the opinion omitted information that rendered the opinion misleading. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017), 856 F.3d at 615-16 (citing *Omnicare*, 575 U.S. at 185-86, 194). With respect to the third prong, Plaintiffs must allege "facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have— whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. Plaintiffs do not allege that Dropbox did not hold the beliefs it stated, nor do they allege that any of the fact's supporting Dropbox's statements were untrue. And under *Omnicare*'s the third prong the Plaintiffs fail to read Dropbox's User Characteristics Statement fairly and in context, *see, e.g., West v.*

14

*eHealth, Inc*., 2016 WL 948116, at *5 (N.D. Cal. Mar. 14, 2016) (rejecting "interpretations of the statements that are taken out of context and are not plausible on [their] face."), let alone plead "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have," *Omnicare*, 575 U.S. at 194 (emphasis added). As the Supreme Court acknowledged in *Omnicare*, this is "no small task for an investor." *Id*.

Accordingly, the Court GRANTS the Motion to Dismiss the Section 11 claims.

**C.  Section 11 Claims Premised on S-K Item 303**

Plaintiffs allege that Dropbox's IPO registration statement failed to disclose a material and negative trend in violation of Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303. CAC ¶¶ 54, 57, 63-73. They specifically contend that Defendants should have disclosed that "Dropbox was experiencing a material decline and/or slowdown in terms of user-conversions and revenue growth at the time of the IPO." CAC ¶¶  54, 57. In this Motion to Dismiss, Defendants argue that Plaintiffs fail to allege facts supporting (1) the existence of the declining user conversion rate, (2) Dropbox's knowledge of the alleged trend, and (3) the materiality of this trend. ECF 71 at  18-19.

Item 303 of Regulation S-K requires that a company disclose "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "Allegations which state a claim under Item 303(a) of Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

The Court will not linger on Plaintiffs' allegation that Dropbox did not disclose a trend of declining growth rate. Put simply, and as discussed at length above, there is abundant evidence in the Registration Statement to the contrary. *See Belodoff.*, 2009 WL 1293690, at *12 ("[disclosed] facts cannot form the basis for a Regulation S–K violation or the nondisclosure of an adverse trend."); *Mallen v. Alphatec Holdings, Inc*., 861 F. Supp. 2d 1111, 1127 (S.D. Cal. 2012) (finding

15

United States District Court
Northern District of California

1  no Item 303 liability where defendant disclosed trend in Form 10-K); *see, e.g.*, RS at 1, 80-81

2  (disclosing growth rates for eight quarters preceding the IPO). Anyone with basic mathematical

3  skills could discern that while Dropbox's revenue was increasing, it did so at a declining rate.

4  Dropbox disclosed its yearly and quarterly revenue, and simple arithmetic shows that the rate of

5  increase was declining. *See e.g., In re Skechers USA, Inc. Sec. Litig.*, 2020 WL 1233759, at *14

6  n.13 (S.D.N.Y. Mar. 12, 2020) (rejecting purportedly undisclosed trend where "any reasonable

7  investor could have calculated the allegedly omitted trend").

8        Plaintiffs' argument about Dropbox's declining user conversion rate has only marginally

9  more steam. At the motion hearing, Plaintiffs acknowledged that this Item 303 issue is the focal

10 point of its complaint. But at no point do Plaintiffs forward any factual allegations about

11 Dropbox's user conversation rate, let alone a data point or trend line. While the Court must accept

12 all factual allegations as true during a motion to dismiss under Fed. R. Civ. P. 12(b)(6), there are

13 no facts for the Court to accept true here—only conclusory allegations. The Court has discussed

14 this at length. *See* Section III.B.

15        The complaint is similarly devoid of any factual pleading regarding how Dropbox's

16 allegedly waning user conversion rate had a materially adverse impact on the company's revenue.

17 *See* 17 C.F.R. § 229.303(a)(3)(ii) (requiring disclosure where a trend "will have a material

18 favorable or unfavorable impact on net sales or revenues or income"); *Welgus v. TriNet Grp., Inc.*

19 ("*Welgus II*"), 2017 WL 6466264, at *24 (N.D. Cal. 2017) ("This one-off allegation does not

20 support an inference that the 'adverse trends' were either known to Defendants or could have

21 reasonably been expected to have a material impact on TriNet's net sales, revenues or income");

22 *Mallen*, 861 F. Supp. 2d at 1127 ("Plaintiffs fail to allege any facts to show that such delays . . .

23 could *reasonably be expected to* have a *material* impact") (emphasis in original). This explanation

24 is particularly crucial in light of the fact Dropbox's revenue continued to grow after its IPO. And,

25 because Dropbox's revenue is driven by three core factors, Plaintiffs must allege facts that

illustrate that a declining user conversion rate was the specific reason for Dropbox's decreasing revenue growth rate, as opposed to the other two factors or some combination of the three. *See Fresno Cty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694, 695 (9th Cir. 2015) (holding plaintiffs failed to allege that inventory problems materially impacted defendant's revenue because it did not explain "how the quality of [that] inventory factored into [defendant's] revenue projections"). Here, Plaintiffs fail to allege any facts demonstrating that the role user conversion plays in Dropbox's revenue creation trumps the role of the other two indicators.

Plaintiffs also fail to allege knowledge. Plaintiffs seem to contend that they have satisfied this requirement because "the Motion [to Dismiss] explicitly concedes that Defendants knew the 'rate of paying user growth had slowed at the time of the IPO and that its rate of revenue growth had slowed as well.'" ECF 80 at 15. The Court is baffled by this explanation. It is simply nonsensical for Plaintiffs to contend, on one hand, that the Court should infer Defendants knew of a declining user conversion trend because of a slowing rate of paying user growth and, on the other, that Dropbox's disclosure of this paying user growth statistic was insufficient to relieve them of liability under Item 303. Defendants cannot have it both ways.

Plaintiffs have failed to allege sufficient facts to show that the Defendants omitted a known material trend from Dropbox's Registration Statement that was not adequately captured by the disclosure of declining revenue and paying user growth rates. The Court thus GRANTS the Motion to Dismiss the claims predicated on Item 303.

**D.  Section 15 of the Securities Act**

To state a claim for controlling person liability under Section 15 of the Securities Act, 15 U.S.C. § 77o, Plaintiffs must establish that (1) there was a primary violation of federal securities laws and (2) the defendant possessed actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). For the reason's discussed above, Plaintiffs

1    fail to establish a primary violation of federal securities law. Accordingly, the Court GRANTS the

2    motions to dismiss the claims based on Section 15.

3        **E.  Statute of Limitations**

4        The Court's determination that Plaintiffs failed to adequately plead claims under Section

5    11 and 15 is dispositive in resolving Defendants' motion. The statute of limitations, however,

6    poses yet another threat to the survival of Plaintiffs' claims.

7        Claims brought under the Securities Act are barred "unless brought within one year after

8    the discovery of the untrue statement or the omission, or after such discovery should have been

9    made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The one-year period "begins to

10   run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the

11   facts constituting the violation—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633,

12   653 (2010). "Plaintiffs are considered to have discovered a fact when a 'reasonably diligent

13   plaintiff would have sufficient information about that fact to adequately plead it in a complaint ...

14   with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.' " *F.D.I.C. v.

15   Countrywide Fin. Corp.*, 2012 WL 5900973, at *2–3 (C.D. Cal. Nov. 21, 2012) (quoting *City of

16   Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). This is a "fact

17   intensive" inquiry, and some courts have held it is "usually not appropriate" to conduct it at the

18   pleading stage. *Rafton v. Rydex Series Funds*, 2011 WL 31114, at *9 (N.D. Cal. Jan. 5, 2011)

19   (citation omitted); *Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-4921, 2014 WL 3749759, at *4

20   (N.D. Cal. July 29, 2014). A defendant seeking to establish that a Section 11 claim is time-barred

21   on a motion to dismiss faces an "especially high burden." *Rafton*, 2011 WL 31114, at *10. "At the

22   pleading stage, the question is whether it is plausible that [the] disclosures were insufficient to

23   supply a reasonably diligent plaintiff with the information necessary to plead the Section 11

24   claims with sufficient detail and particularity to survive a 12(b)(6) motion." *Booth*, 2014 WL

25   3749759, at *6.

United States District Court
Northern District of California

18

Defendants contend that Plaintiffs "were on notice of the facts underlying their claims over a year before they filed their initial complaint on October 4, 2019." ECF 71 at 19. They specifically claim that the statute of limitations was triggered, at the very latest, when Dropbox made its 2Q'18 financial disclosure on August 10, 2018 because at that point the company "had reported 18 quarters of revenue and three and a half years of paying users, from which any reasonably diligent plaintiff could easily calculate Dropbox's growth rates." ECF 71 at 19-20. They further argue Plaintiffs could not have become aware of any declining user conversion rate trend because the company did not disclose this information during the announcement—or during any announcement—and "the results for that quarter reflected growth in both metrics that were entirely consistent with Dropbox's past performance." ECF 84 at 13.

In response, Plaintiffs contend that they "first became aware" of their claims during Dropbox's 3Q'18 disclosure on November 9, 2018 because it was only then that it was revealed that the "ongoing trend of decelerating revenue growth and user conversion rates had been exacerbated, and that Dropbox had still only converted 12.3 million" paying users. ECF 80 at 19. They further explain that (1) "the point in time in which a trend becomes meaningful, material, or actionable is a fact-intensive inquiry that is inappropriate at the pleading stage," (2) Defendants' focus on August 10, 2018 is arbitrary, and (3) the Defendants' invocation of the Registration Statement disclosures to prove notice flies in the face of Plaintiffs' allegations on the merits that such disclosures were misleading and deficient. ECF 80 at 19-21.

The Court rejects Plaintiffs' third rationale straight off the bat. As discussed above, Defendants' Registration Statement disclosures were not deficient in the context of Plaintiffs' pleadings. The Court credits Plaintiffs' second concern about the fact-intensive nature of this inquiry. But while the motion to dismiss is *usually* not the appropriate juncture for the Court to make a conclusion about inquiry notice, the Court is not categorically precluded from doing so.

The Court thus turns to the heart of this dispute, whether Plaintiffs were on inquiry notice of Dropbox's allegedly declining user conversion rate. A brief traipse down memory lane is instructive. Plaintiffs filed the instant lawsuit on October 4, 2019. ECF 1. As such, a reasonably diligent plaintiff must have been on notice of the claims in the CAC no earlier than October 4, 2018. Dropbox filed its Registration Statement with the SEC on March 22, 2018, which contained a slew of financial information. *See* ECF 72, Exh. 1. Dropbox's IPO was on March 23, 2018. CAC ¶ 39. After its IPO, Dropbox made quarterly financial announcements from  announced quarterly financial updates. *See* ECF 72, Exhs. 2-9 (Form 10-Q for 1Q'18 through 3Q'19, Form 10-K for fiscal year 2019). Relevant here, Dropbox made quarterly  announcements for 2Q'18 on August 10, 2018 and for 3Q'18 on November 9, 2018. On November 8, 2018, the financial firm D.A. Davidson published a report on Dropbox's 3Q'18 finances, noting that the company "reported a solid 3Q, marked by stable revenue growth, the first in at least 11 quarters" and that this previous revenue growth deceleration "ha[d] been an ongoing concern for investors." *See* ECF 81, Exh. 1. The report made various references to users' adoption of paid Dropbox plans, noting that "Dropbox is seeing fewer users than expected adopting annual plans" and "the Plus plan repricing and repackaging has driven healthy conversion." *Id*. It did not, however, discuss the user conversion metric within the meaning of this lawsuit.

The Defendants also provided a chart summarizing Dropbox's financials over time. Plaintiffs do not dispute the legitimacy of the underlying financial data.



United States District Court
Northern District of California

ECF 71 at 11.

As an initial matter, the Court notes that any inquiry notice must be derived from information about Dropbox's revenue and paying user metrics—not user conversion rate. The Defendants state that Dropbox has never released any information regarding its user conversion rate, and the Plaintiffs' do not plead facts to the contrary.[1] As such, the Court considers "whether it is plausible that [the revenue and paying user] disclosures were insufficient to supply a reasonably diligent plaintiff with the information necessary to plead the Section 11 claims with sufficient

---

[1] Plaintiffs' contend that Dropbox's 10-Q Form from 3Q'18 disclosed that "Dropbox had still only converted 12.3 million of its more than 500 million registered users into paying users." ECF 80 at 19. Because this allegation cannot be found in the CAC, the relevant Form10-Q, or the financial report, the Court disregards it. The Court notes that Dropbox's Form 10-Q from 3Q'18 does state that "[w]e've built a thriving global business with 12.3 million paying users." *See* ECF 72, Exh. 4. The difference between the metric cited in the 10-Q Form and Plaintiffs' characterization of this metric further highlights the Court's earlier discussion about the insufficiency of Plaintiffs' claims. *See* Section III.B-C.

1   detail and particularity to survive a 12(b)(6) motion." *Welgus*, 2017 WL 167708, at *20 (internal

2   quotation marks and citation omitted).

3          Although the Court has already determined Plaintiffs' claims lack sufficient detail and

4   particularly, the Court nonetheless concludes Plaintiffs have not met their burden to plead facts

5   supporting delayed discovery either. The information available to the Plaintiffs from March

6   through October of 2018 was abundant and largely consistent with the Registration Statement. The

7   Registration Statement disclosed slowing revenue and paying user growth rates in March 2018.

8   *See Rudman v. CHC Grp. LTD*, 217 F. Supp. 3d 718, 724 (S.D.N.Y. 2016) (statute of limitations

9   triggered where an allegedly concealed "fact was largely obvious from disclosures in the

10  Registration Statement itself."). Dropbox made financial announcements consistent with this

11  disclosure in the following two quarters. *See* ECF 72, Exhs. 2-3 (Form 10-Q for 1Q'18 through

12  2Q'18); *see also* ECF 80 at 6 (charts of revenue and paying user growth).

13         While Plaintiffs contend that the November 2018 financial report crystallized the trend, the

14  report itself contradicts Plaintiffs' theory of notice. The report notes that "[Dropbox] reported a

15  solid 3Q, marked by stable revenue growth, the first in at least 11 quarters" and that "this was the

16  first quarter (in at least eleven quarters) where growth did not decelerate." *See* ECF 81, Exh. 1 at

17  2. If anything, the report announced the reversal of the downward trend. And, given the

18  straightforward nature of the metrics at issue, the Court is not otherwise inclined to credit the

19  report as finally providing the Plaintiffs the sufficient insight they needed to be on notice absent

20  factual allegations supporting Plaintiffs' contention. Unlike Plaintiffs' cited authorities, this case

21  involves easily digestible, regularly disclosed metrics. *Compare with In re Bare Escentuals, Inc.*

22  *Securities Litigation*, 745 F. Supp. 2d 1052 (N.D. Cal. 2010) (claims based on "self-cannibalizing

23  sales operations, premium product image dilution through sales to big-box discounters, failing

24  efforts to revitalize the infomercial sales and to cross-sell, and heavy reliance on the negative

25  option club program"); *Booth, Inc.*, 2014 WL 3749759 (N.D. Cal. July 29, 2014) (claims based on

*United States District Court*
*Northern District of California*

22

United States District Court
Northern District of California

1    the sufficiency of a corporation's internal controls over conflicts of interest); *Rafton*, 2011 WL

2    31114 (N.D. Cal. Jan. 5, 2011) (claims based on a "'mathematical compounding effect' that would

3    cause the Fund to deviate from its benchmark, the inverse price of the 30–Year U.S. Treasury

4    Bond"). The "evidence irrefutably demonstrates [P]laintiff[s] discovered or should have

5    discovered" that the Registration Statement contained misstatements or omissions at least a year

6    before October 4, 2019. *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir.1996) (citation

7    and internal quotation marks omitted).

8        The COURT GRANTS Defendants' motions to dismiss on the alternate ground that the

9    claims alleged in Plaintiffs' complaint are time-barred.

10        **F.  Leave to Amend**

11        In deciding whether to grant leave to amend, the Court must consider the factors set forth

12    by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the

13    Ninth Circuit in *Eminence Capital, LLC v. Aspeon*, Inc., 316 F.3d 1048 (9th Cir. 2009). A district

14    court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1)

15    undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by

16    amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. Eminence

17    Capital, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries

18    the greatest weight." *Id*. However, a strong showing with respect to one of the other factors may

19    warrant denial of leave to amend. *Id*.

20        Although Defendants request that the Court dismiss Plaintiffs' claims with prejudice

21    because they are time barred, ECF 71 at 19-20, the Court concludes that it is not yet futile for

22    Plaintiffs to cure this deficiency, along with the others discussed above. As stated at the hearing,

23    Plaintiffs must, at a minimum, identify some factual circumstance that plausibly distinguishes

24    their state of awareness of these claims in November 2018 that was not disclosed in the August

2018 quarterly report or earlier. As such, the Defendants' motions to dismiss with respect to all claims are GRANTED WITH LEAVE TO AMEND.

## IV.  ORDER

For the foregoing reasons, the Defendants' Motions to Dismiss are GRANTED WITH LEAVE TO AMEND. Plaintiffs shall file an amended complaint **no later than January 6, 2020**.

Dated: October 21, 2020

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California